1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ROBERT DEAN MAYS,** | **Case No.: 11-CV-5531 YGR** |
| **Petitioner,** | |
| **v.** | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| **ANTHONY HEDGPETH, Warden,** | |
| **Respondent.** | |

**INTRODUCTION**

Now before the Court is a habeas corpus petition filed by Petitioner Robert Dean Mays pursuant to 28 U.S.C. section 2254.  (Dkt. No. 1.)  Respondent Anthony Hedgpeth has filed an answer and a memorandum of points and authorities in support thereof (Dkt. No. 6); Petitioner has filed a traverse (Dkt. No. 7).

For the reasons set forth below, the petition for such relief is **DENIED**.

**BACKGROUND**

Petitioner was originally charged by amended information with first degree murder (§ 187, subd. (a); count 1) and conspiracy (§ 182, sub. (a)(1); count 2).  The information further alleged that, in the commission of the offense in count 1, as a felony enhancement, Petitioner personally and intentionally discharged a handgun (§ 12022.53).

Petitioner originally pleaded guilty to the charges against him and admitted that he had discharged a handgun.  Petitioner then moved to withdraw his guilty plea.  The trial court denied that motion and sentenced petitioner to an indeterminate sentence of 50 years to life.  Petitioner appealed,

and the California Court of Appeal reversed the conviction and remanded to the trial court with instructions to allow Petitioner to withdraw his guilty plea. *People v. Mays*, 2007 WL 2774702.

After Petitioner withdrew his guilty plea, his trial began on March 2, 2009. The case went to the jury on March 26, 2009. After the second day of jury deliberation the court excused one of the jurors. With a new juror in place, deliberations continued. After three more days of deliberation the jury returned a verdict finding Petitioner guilty of first degree murder and finding that he discharged a firearm in the commission of that crime. On June 26, 2009, the court sentenced Petitioner to two consecutive sentences of 25 year to life in prison, for a total sentence of 50 years to life.

On January 5, 2011, the California Court of Appeal affirmed Petitioner's conviction. *People v. Mays*, No. H034465, 2011 WL 18743 (Cal. Ct. App. Jan. 5, 2011). Petitioner filed a petition for review with the California Supreme Court, which it denied on April 13, 2011.

Petitioner filed the instant petition for habeas corpus on November 15, 2011. That Petition is now fully briefed and is ready for review on the merits.

## UNDERLYING FACTS

The Court adopts as its account of the facts the summary set forth in the last reasoned opinion in this matter, the California Court of Appeal's decision on direct review of Petitioner's conviction. *People v. Mays*, H034465, 2011 WL 18743 (Cal. Ct. App. Jan. 5, 2011).[1] Those facts are as follows:

> In 2004, Peter Bianco, a remodeling contractor, lived at 2206 Maroel Drive in San Jose. Bianco paid workers that he hired in cash or in drugs that he sold from his house. Appellant and his friend Rick Reinhardt worked for Bianco at times; both were users of the methamphetamine that Bianco supplied to them. In February 2004, they were working for Bianco on a house in Cupertino owned by Ling Hullon.
>
> Hullon saw Bianco around 6 p.m. on Sunday February 22, at her property in Cupertino; they discussed work Bianco was doing that was to resume the next day. Brandy van Zandt delivered some cabinet doors to Bianco's home around 9:30 p.m. Sunday night. Bianco took her to dinner at a Carrows restaurant. They left the restaurant at about 11:45 p.m. and returned to Bianco's house. Ms. van Zandt left around 12:15 a.m. just as Bianco was repositioning his cars to put his Corvette back in the garage.

---

[1] For purposes of context and clarity, the Court notes that Petitioner, who was ultimately convicted of killing Bianco, initially told police another person, Reinhardt, was the perpetrator.

United States District Court
Northern District of California

On Tuesday, February 24, Hullon paged Bianco, but he did not answer. Hearing from neighbors of her Cupertino property that Bianco had not been back there, she went to his house about 8 or 9 p.m. She knocked on the door, but there was no response. She saw mail in his mailbox and left him a note on his Verizon phone bill. The next day, sometime in the afternoon she returned to Bianco's house because she had still not heard from him. Hullon knocked and tried to open the door, but was not successful.

On Thursday, February 26, Detective Jennifer Kurz was dispatched to Bianco's house for the second time that month. Earlier, on February 13 she had been sent there on a call about a possible burglary. That time, she went alone, spoke to Bianco and looked around the house, noting that it was "very neat and tidy." On February 26, she was responding to a dispatch regarding another possible burglary or "person down call." Detective Kurz met Laura Derrickson at the front door to Bianco's house. Derrickson had been in the house and called the police as a result of what she had seen. Detective Kurz got the key from Derrickson and conducted a protective sweep of the house. There were no signs of a forced entry. The house appeared to be "completely ransacked." In the garage, between two vehicles, Bianco's body was under what appeared to be a car cover and a yellow storage bin. There were red stains that appeared to be blood on the floor near the entry to the house, near the body, in front of the Corvette and on a pillow and hamper.

Bianco's body was face down. He was clad in a black shirt and pants and brown shoes. His right arm was bent at the elbow and his right hand was near his face. A tan jacket and a pillow were near Bianco's head. No shell casings were found in the garage. Among the items that were found in the house was a vacuum cleaner. In the bag of the cleaner there was an envelope containing $2400. Police officers located a plastic bag containing $40,000 in hundred dollar bills in an engine block that was on a stand in the garage.

An autopsy examination of Bianco's body revealed a total of six wounds that represented five wound tracks. One non-fatal wound to Bianco's shoulder appeared to come from a distance because there was no soot or stippling around the wound or on Bianco's clothing. An entrance wound located on Bianco's right hand and an exit wound on his right wrist, combined with the trajectory of the wound to Bianco's right eye, which had bullet fragments inside, indicated an injury consistent with being shot through the hand as Bianco held it up to defend himself. No soot or stippling were associated with those wounds indicating the shot came from a distance, but soot and stippling were found on wounds to Bianco's nose and forehead (between the eyes). The soot and stippling around the gunshot wound to the nose indicated that it came from about an inch to three feet away. The stippling and soot around the gunshot wound to the forehead indicated that the gun was in contact with the skin. According to the forensic pathologist, this was the fatal wound since the bullet hit vital structures on the brain. Bianco would have died instantly and dropped to the ground. He had face and neck injuries consistent with his face striking the ground in a single fall.

The doctor that performed the autopsy opined that the first wound was to Bianco's back because it was from a distance. The second went through Bianco's right hand and into his eye. The third shot was to the nose and went into the maxillary sinus, but was not immediately lethal. The fourth or last shot would have been the "contact between the eyes, which would have been immediately lethal."

Just after midnight on February 29, 2004, Sergeant Stewart Davis received a call from communications regarding a Mr. R. having information about the Bianco homicide.  Sergeant Davis called the number he had been given and Mr. R. identified himself as appellant.  Appellant said that his friend Rick Reinhardt had had a confrontation with Bianco and threatened to "cap" or shoot him.  Appellant claimed to have seen a .22 caliber Browning semi-automatic pistol at Reinhardt's home on February 25 or 26.  Appellant repeated these claims when he was interviewed by Detective Enrique Garcia later on February 29.

Officers searched Reinhardt's house in Redwood City on March 1.  Between the mattress and box spring of Reinhardt's bed, the officers found a Browning semi-automatic pistol and ammunition, drug paraphernalia and a Ziploc bag with white crystals, believed to be methamphetamine and two key rings with keys.  When tested, the keys unlocked both the front door locks of Bianco's house and two cars that were parked in the driveway.

Criminalist Eric Barloewen, who specialized in firearms, tested the weapon found in Reinhardt's house and two "spent projectiles" recovered from Bianco's body at the autopsy.  No fingerprints or blood stains were found on the gun.  Barloewen test fired the gun to determine if the gun could have fired the projectiles.  He concluded that the gun could have fired both, but damage and loss of detail to the fragments meant that other .22 caliber firearms could not be excluded. Barloewen testified that in order to fire the gun, the trigger needs to be pulled for each discharge.

Appellant was re-interviewed by Detectives Garcia and Manion on March 10 and June 23, 2004.  Reinhardt was arrested and a preliminary hearing was held on July 26, 2004.  Appellant testified against Reinhardt, who spent more than eight months in custody for the Bianco homicide.

Reinhardt testified at appellant's trial that the gun, keys and other items found in his bed were not his.  Reinhardt had known Bianco for about 10 years; had worked for him as a laborer and had been to his house as many as 25 times a week to obtain drugs.  It was common for Bianco to pay Reinhardt for his construction work with drugs.  Bianco paid other people the same way.

Reinhardt saw Bianco on February 22 and tried to reach him by telephone unsuccessfully about 50 times in the following days. Reinhardt testified that in

late December 2003, he and appellant had a discussion about burglarizing Bianco's house.  Appellant wanted Reinhardt to "help him with setting Pete up."

In January 2004, Dorothy Motschenbacher, Timothy Bordin and Timothy Rooney were all living in Bianco's house.  Motschenbacher, a 24 year old methamphetamine user, was Bianco's girlfriend and had been Reinhardt's girlfriend.  In early February, Bianco and Motschenbacher got into an argument and she, Bordin, and Rooney moved out.  They all moved into an apartment in Sunnyvale with John Scott Vasquez, another of Motschenbacher's boyfriends.

On February 17, appellant went to the Sunnyvale apartment to purchase a fake "ID kit" from Rooney.  Rooney testified that appellant said he working on the idea of burglarizing Bianco's house.  They agreed that if appellant stole money, he would keep 50 percent and Rooney and Motschenbacher would split 50 percent.  Motschenbacher's key to Bianco's house was given to appellant.  Appellant said he would call and update them, but he never called.

Motschenbacher testified that at the February 17 meeting, there was no conversation about burglarizing Bianco's house.  She admitted telling the police there was such a conversation and that Rooney gave appellant a key to Bianco's house, but she lied to the police.  At the time she was using a lot of methamphetamine.

Bordin testified that he heard Motschenbacher offer to give appellant a key to Bianco's house, but he did not see her get it, or give it to appellant.

Appellant testified in his own defense.  Appellant admitted shooting Bianco, who was his methamphetamine dealer.  Appellant explained that he did meet with Motschenbacher and Rooney.  He needed to get a fake ID because he had to go to Oregon, but he had a pending case there.  At the meeting there was a discussion about Bianco's house having been burglarized two weeks before, but there was no mention of a future burglary and no transfer of a key.  The meeting was short; appellant thought the others were trying to get him out of the house.

Around this point in time, appellant was working for Bianco.  He was refinishing stucco on a house Bianco was remodeling.  On the Friday before the Sunday that Bianco was killed, appellant went to Bianco's house to get paid $1300 that Bianco owed him for the job.  Bianco told him to return the next day.  When appellant returned, Bianco told him to return on Sunday.  On Sunday, Bianco gave appellant $186 for two receipts that appellant produced, but Bianco tried to get appellant to accept methamphetamine in payment instead of cash for the $1300 he owed appellant.  Appellant refused and told Bianco he was not going to leave until he got paid.

According to appellant, Bianco went into the garage, opened a tool box and pulled out a gun.  Appellant grabbed Bianco's arm and the gun went off.  Appellant testified that he "freaked out," grabbed the gun and shot four or five

5

times.  He took the gun and gun case, along with $186 Bianco had paid him and left.

Appellant returned to Bianco's house two nights later through the partially open garage door.  He saw the house was "messy," although he had not left it that way on Sunday.  He planted the gun, gun case, ammunition and drugs under Reinhardt's bed, and then made calls to the police.  He testified at Reinhardt's preliminary hearing, but did not tell the truth.

Appellant told the jury he had no plan to commit a burglary and had no discussions with Motschenbacher or Rooney or anyone else about committing a [burglary].  He only wanted Bianco to pay him for the work he had done.  When asked about statements he had given to the police during an interview he gave after he was arrested, he said that he was "mak[ing] things up as [he] ... went along" and thought it was "a more serious crime if [he] told them [he] went over there got in a fight with [Bianco] and took his gun away and killed him." "[He] was thinking that that was worse."  He never thought about self-defense, "[n]ot the way it was put to [him], no.... [¶] Not the way that the interrogation went...." He said he lied many times in the case, but he was not lying now.

During the prosecution's case in chief, the jury heard a recording of approximately two hours of the much longer police interrogation of appellant conducted by a homicide detective, William Manion, and Sergeant Garcia, shortly after appellant was arrested on December 14, 2004.

During the interrogation appellant claimed that the shooting was an accident. Manion asked appellant how the shooting had happened. Manion suggested that Bianco had tried to grab the gun and that appellant had panicked. Appellant replied, "I guess you could say that."  Appellant said that he was in the garage when Bianco came in and was startled by him.

Appellant said that he did not plot with Motschenberger, Rooney and Bordin to burglarize Bianco's house.  He went alone to Bianco's house, but took the Browning .22 he had had for eight or nine years, not because he wanted to hurt anyone, but because he "didn't know what [he] was getting into."  Appellant saw Bianco leave and he left too, but returned before Bianco did and searched for money in the front room, kitchen, dining area and garage.  Appellant said he was in the garage when Bianco came home.  Bianco parked his Corvette in the garage and went into the house.  Appellant was against the wall on the other side of the garage trying to feel his way around in the dark when Bianco came into the garage from the house.  Bianco was holding something in his hand.  When Bianco started swinging the "pole ... or club" that he was holding, appellant became scared, panicked, and pulled the gun from the pocket of his pants and without really aiming, fired four or five times from a couple of feet away.  Bianco fell face down near the door to the kitchen with his feet toward the garage door. Appellant put a car cover over him.  Appellant claimed he did not shoot Bianco when he was down and did not search his pockets.

Appellant told the officers that after the shooting, he found and took $180 in twenty dollar bills and some keys from the kitchen, along with some drugs from a drawer in the kitchen.  He left Bianco's house through the garage door, but returned a day or two later in the hope that Bianco was still alive.  He got back in through the garage door and could tell somebody had been in the house because it was "a shambles."  Appellant found the shell casings from the shooting, but did not go back for that purpose.  Later, he threw the casings away at a car wash near his house.  He put the items from Bianco's kitchen under Reinhardt's bed along with the Browning, which he said he probably wiped off.  Appellant explained that he didn't really plan on putting items there, but when he went to Reinhardt's house to get some tools he became mad at Reinhardt who "set himself up for it."

During the early part of the interrogation, appellant gave Sergeant Morales some information about a storage locker that he had.  Sergeant Morales obtained a search warrant.  The warrant was executed later on December 14, 2004, by Officer Kirby and others.  Officers searched the Los Altos house where appellant was living.  In the garage officers found two .22 caliber rifles, gun cleaning and ear protection equipment as well as several boxes and a bag of loose ammunition.  In a suitcase were three .22 caliber rifle magazines used to enable one to fire a number of times without having to stop, along with an assortment of ammunition.  From a metal cabinet in a side yard, officers retrieved several boxes of ammunition and shotgun rounds, gun parts, cleaning supplies, and books and magazines about gun shopping, ownership and use.  In appellant's storage locker at a facility on Laurelwood Road, officers found a collection that Officer Kirby listed in his report as "gun books, magazines, Gun Digest, catalogs, concealed weapons/invisibility manuals, and military books."

Criminalist Eric Barloewen was given the ammunition to categorize.  Almost all the ammunition found in the suitcase could be fired by the Browning .22 caliber pistol he tested.

**Jury Deliberations**

The case went to the jury on March 26, 2009.  During the second day of deliberations, the jury foreperson (Juror No. 12) informed the trial judge that Juror No. 8 had "made a statement that alluded to the fact that she had not followed [the court's] admonition" as far as "doing research or looking at other things" concerning the case. The foreperson stated that he did not hear the statement "clearly," but it "was something to the fact that fifty years to life, and he may have had-the defendant may have had a trial previously." The foreperson informed the court that another juror had questioned Juror No. 8 on how she knew or heard the information. At the time all 12 jurors were present in the jury deliberation room, but there were no discussions related to the comments. The court told the foreperson not to discuss what had happened with the rest of the jurors when they reconvened.

7

After the foreperson left the courtroom, the court stated for the record that it would make further inquiries when the jurors reconvened on the following Monday.

Thereafter, defense counsel moved for a mistrial asserting juror misconduct and requesting that the court determine whether or not the misconduct should result in a new trial. Specifically, counsel argued that it was "clear that Juror # 8 is in possession of information that was NOT presented on the witnesses stand, and although it is clear that she has shared that information with the other jurors, it is unclear when, where, and how she obtained that information." Counsel went on to request that Juror No. 8 be removed from the jury and the court declare a mistrial because the possibility of "'UN-RINGING THE BELL'" existed and even if the court told the jurors not to consider the information or that the information was false, nevertheless, the admonishment would not cure the problem.

When court reconvened, the court informed counsel that it intended to question Juror No. 7, but that Juror No. 8 had called in to say that she was ill with Vertigo.

When asked what she had heard from Juror No. 8, Juror No. 7 told that court that during deliberations, Juror No. 8 said "'Well, you know, he's already been convicted,' or, 'He already got fifty years for this.'" Juror No. 7 told the court that when she questioned Juror No. 8 about how she knew this, Juror No. 8 said, "'Oh, well, my friend, um, told me about this....'" Juror No. 7 confirmed that the comments were not discussed during deliberations.

The court told Juror No. 7 that the information she had received from Juror No. 8 was not evidence and that it could have been based on misinformation. The court reminded Juror No. 7 that her decision in the case had to be based on what she heard in the courtroom. Juror No. 7 told the court that while she understood that, she felt that Juror No. 8 had "formed an opinion somewhat based on that." The court asked Juror No. 7 if she could set aside what she heard and decide the case based on the evidence presented. She confirmed that she could.

After hearing from the remaining jurors, some of whom heard the information that Juror No. 8 revealed during deliberations, the court listened to the argument of counsel. Defense counsel argued that after hearing from the jurors he thought that "things had changed slightly." He still thought that there should be a mistrial. However, he went on to say that Juror No. 8 should be removed and replaced with alternate No. 1. Defense counsel said he was "gravely concerned about this jury," and was not "backing off from [his] position" that there be a mistrial, but "[a]ssuming that we call in Alternate Number 1," he thought that the court needed to voir dire her before she took her seat to make sure she had not "done something in the intervening days." The prosecutor agreed that Juror No. 8 should be removed, but took the position that Juror No. 8's comments were not discussed by the remaining jurors and the remaining jurors were very clear that

they understood the comments were not evidence and they all said they could continue to deliberate and be fair and impartial.

The court refused to rule that there was juror misconduct without talking to Juror No. 8. The court ruled, however, that Juror No. 8 would be excused because "she's basically unable to continue with her ... job as a juror because of her illness."

Ultimately, the court denied the motion for a mistrial.

*People v. Mays*, 2011 WL 18743, at *1-7.

## STANDARD OF REVIEW

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

Further, even if a constitutional error is found, habeas relief may only be granted if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 784 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

## DISCUSSION

As grounds for federal habeas relief, Petitioner advances two claims: (1) that the state trial court violated Petitioner's Fifth and Fourteenth Amendment rights when it admitted his involuntary confession; and (2) that the state trial court violated Petitioner's Sixth Amendment right to a fair trial and Fourteenth Amendment due process rights when it refused to declare a mistrial after one juror told other jurors during the course of deliberations that Petitioner had previously been convicted of the same crime and sentenced to 50 years to life.

The Court considers each claim in turn.

## I.   ADMISSION OF PETITIONER'S CONFESSION

### A.   Background

Petitioner argues that the court of appeal erred when it upheld the trial court's decision to admit his confession into evidence.  Specifically, Petitioner claims his confession was involuntary, and its admission violated his Fifth Amendment right against self-incrimination and his Fourteenth Amendment due process rights.

The Court of Appeal considered Petitioner's arguments and disposed of them as follows:

> Sergeant Manion testified that appellant came under suspicion in this matter in mid-October 2004 and was arrested on a warrant he secured on December 14, 2004.  After appellant had been in custody about 45 minutes, he interviewed appellant. Sergeant Morales was present with him in the interview room. Appellant appeared nervous, but spoke clearly.  From his previous contacts with appellant over eight or nine months, Sergeant Manion knew that appellant was a methamphetamine user.  However, on that day he saw no signs that appellant was under the influence of drugs and he did not have him tested.

> After reading appellant his Miranda rights, Sergeant Manion began questioning appellant by telling him that the case had changed due to new evidence inconsistent with some of the things that appellant had told him in earlier interviews.

United States District Court
Northern District of California

In the early stages of the interview, appellant was told that the police had more information than they did. He was given both true and false information. The true evidence included information from appellant's cell phone records and from witness statements by Motschenbacher, Bordin and Rooney. Sergeant Manion pointed out to appellant inconsistencies and contradictions in some of the things appellant had told him on previous occasions, such as his explanation of his whereabouts at the time of his call to the police and relative to what he would have been able to see on the weapon found at Reinhardt's house. The false information that Sergeant Manion told appellant was that there was a tape recording of him in an incriminating conversation, that there was DNA evidence linking him to Bianco's keys and that there were hairs from his dog in the gun case found at Reinhardt's house.

Early in the interview, there was a discussion concerning the Scott Peterson case. Specifically, Sergeant Manion asked appellant if he had followed the Peterson case and mentioned that Peterson had just got a "'severe penalty.'"  Then, Sergeant Manion explained that the case was built on circumstantial evidence; nobody saw Peterson kill his wife, but the jury had no problem in finding Peterson guilty.  Sergeant Manion mentioned that it was similar to this case except this case was better.

Faced with appellant's denials that he had anything to do with Bianco's death, Sergeant Manion invited appellant to speculate how the crime had been committed and what the penalty should be if the shooting was an accident during the course of a burglary, rather than if the shooter had been lying in wait.

Near the end of the first part of the interview, Sergeant Manion told appellant that if he told him the truth he would go to the District Attorney and fight for him. Sergeant Manion testified that he had in fact explained everything that appellant felt about the killing, including that he had shot Bianco, to a deputy district attorney and told the deputy that he did not think that appellant deserved the death penalty.

During the interview, Sergeant Manion told appellant that he was not a monster; that he thought what had happened was an accident; and he should "come clean about it."  When appellant asked if he would have access to an attorney, Sergeant Manion explained that he could have an attorney at any time.

After listening to the entire recording of the interrogation, the court denied trial counsel's motion to exclude appellant's confession/admissions made during the interrogation.  The trial court made a detailed record of its findings and decision. Specifically, with regard to the voluntariness of appellant's confession/ admissions, the court stated the following[:]

> "Here, Robert Mays, the defendant, was arrested in the morning
> on an arrest warrant for murder and brought to the San Jose Police
> Department.  Approximately 45 minutes later, after being pre-

United States District Court
Northern District of California

processed, he was escorted by Sgt. Manion in an elevator from the preprocessing center to the homicide unit and placed in an interview room.  The defendant was in handcuffs.  Defendant knew Sgt. Manion.  He had been interviewed by Sgt. Manion on four prior occasions.  It was apparent from the recorded interview that the defendant felt comfortable with Sgt. Manion. [¶] Throughout the interview, Defendant Mays refers to Sgt. Manion by his first name.  The defendant also appears comfortable with Officer Morales, who was present during the first part of the interview, and Officer Garcia, who was present during the second part of the interview. [¶] Defendant addressed both Officer Morales and Garcia by their first name as well.  The information before the Court suggests that the defendant was not questioned by any officer after his arrest or before the recording device was turned on.  This is consistent with Sgt. Manion's testimony at the hearing on March 3rd.  [¶]The Court found Sgt. Manion's testimony credible.  The recorded (*sic*) device was on when Sgt. Manion and Officer Morales were in the interview room.  After entering the interview room, Officer Morales provided Defendant Mays with some water. Then, within seconds, the defendant immediately stated, 'I didn't have anything to do with Pete getting killed.'  Sgt. Manion stopped the defendant and essentially informed him that before he could talk to him about it, he had to advise him of his *Miranda* rights.

There is no evidence that any officer threatened the defendant with weapons or harm while advising him of his rights.  [¶]Before the interview began, it was evident that the officers knew that the defendant had prior contact with the criminal justice system.  The defendant had prior criminal convictions, and at the time of the interview, he had a domestic violence matter pending out of Oregon.  In fact, the defendant had retained an attorney to assist him with the domestic violence case pending in Oregon.  [¶]The defendant spoke and understood English very well.  The defendant did not appear to be under the influence of drugs or alcohol.  Sgt Manion also testified that he did not detect any symptoms that the defendant was under the influence of any drugs.  It was clear from the recorded interview that the defendant understood all of the questions that were asked.  He responded appropriately and spoke clearly.

At the time of the interview, the defendant was approximately 48 years old, 5' 10" tall, and lifted weights.  He was divorced with one child.  It seems the defendant worked in a construction related job.  He worked during the day and started work early.  The defendant appeared to be a mature adult man... and was not

intimated by any of the officers questioning him.  The defendant was in the interview room for almost seven hours."

The court made the following findings of fact concerning the length of the interview[:]

"The initial interview lasted approximately 46 minutes. There was then a break for approximately 49 minutes.  The interview resumed for approximately 48 minutes. There was then a short 11 minute break.  The interview resumed and lasted approximately one hour, 23 minutes. There was then a 30 minute break. During this break, the defendant was provided food and ate.  During the interview, the officers provided the defendant with something to drink and offered him things to eat. [¶] After the lunch break, the interview resumed and lasted for approximately 2 hours.  At this time, the interview was basically completed.  There was a break for approximately 30 minutes. The defendant was taken to the restroom.  There were a few additional questions, and the defendant was then escorted out."

As to the substance of the interview, the court found the following[:]

"There was nothing that occurred throughout this interview that suggested that the defendant could not or did not want to continue. Throughout the interview, the defendant sounded alert and gave logical, appropriate responses to questions asked.  The defendant never indicated or suggested that he wanted to terminate the interview. In fact, the officers decided to conclude the interview. [¶] Court finds that the defendant received a full advisement of his Miranda rights.  He clearly understood his right and freely submitted to questioning by the officers.  In fact, the defendant was eager to began [*sic*] talking with the officers.  Defendant's decision to speak with the officers was a product of a free and deliberate choice and not based on any intimidation, coercion, or deception.  [¶]Also, based on the totality of the circumstances, the Court finds that the defendant's confession or admissions were voluntary and not a product of any coercive police activity. Here, the deception by the officers, including some of their evidentiary claims, such as having DNA evidence, fingerprint evidence, and voice recording of conversations involving the defendant were not coercive, nor was deception used by the officers reasonably likely to produce an untrue statement.  [¶]Indeed, toward the end of the interview, Officer Garcia specifically asked the defendant, 'Everything you just cleared up right now and told us, is it the truth?' The defendant's reply was, 'It is the truth.'"

Thereafter, on the subject of defendant telling the truth, the court found that[:]

"during the interview, the officers informed the defendant just to tell him [*sic*] the truth.  At one point, Sgt. Manion admonished the

defendant, 'I definitely don't want you to tell me something you didn't do.'"  Furthermore, the court noted that "after admitting his involvement in the killing and Rick Reinhardt was not involved, Sgt. Manion asked the defendant, 'Is that the truth from the bottom of your heart?  The defendant's response was simply, 'Yes.'"

Finally, the court found that the officers did not "explicitly or implicitly promise[] the defendant any leniency during the interview with him.  The benefits pointed out by the officers to the defendant giving his side of the story or giving a truthful statement were merely those that flow factually from the truthful and honest course of conduct[:]"

> "A defendant's admission or confession challenged as involuntary may not be introduced into evidence at trial unless the prosecution proves by a preponderance of the evidence that it was voluntary. [Citations.] A confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police activity. [Citations.]" (*People v. Williams* (1997) 16 Cal.4th 635, 659 (*Williams* ).)

> "'The due process [voluntariness] test takes into consideration "the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation." ' [Citations.] This test 'examines "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession.' [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093.)  "'[C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.' [Citations.]  Coercive police activity, however, "'does not itself compel a finding that a resulting confession is involuntary."' [Citation.] The statement and the inducement must be causally linked. [Citation.]' [Citation.]" (*Ibid.*)

> "'On appeal, the determination of a trial court as to the ultimate issue of the voluntariness of a confession is reviewed independently in light of the record in its entirety....' " (*People v. Memro* (1995) 11 Cal.4th 786, 826, overruled on other grounds as stated in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.) "However, 'the trial court's findings as to the circumstances surrounding the confession-including "the characteristics of the accused and the details of the interrogation" [citation]-are clearly subject to review for substantial evidence. The underlying questions are factual; such questions are examined under the deferential substantial-evidence standard [citation]....' [Citation.]" (*Ibid.*)

It is beyond dispute that defendant was not subjected to overt physical brutality.  However, this absence is not dispositive, "for 'coercion can be mental as well as physical, and ... the blood of the accused is not the only hallmark of an unconstitutional inquisition.'"  (*People v. Montano* (1991) 226 Cal.App.3d 914, 934, quoting *Blackburn v. Alabama* (1960) 361 U.S. 199, 206.)

The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were "such as to overbear petitioner's will to resist and bring about confessions not freely self-determined." (*Rogers v. Richmond* (1961) 365 U.S. 534, 544.)  Regarding the crucial element of police coercion, among the factors to be considered are the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental health. (*People v. Massie* (1998) 19 Cal.4th 550, 576; *Williams, supra,* 16 Cal.4th at p. 660.)

Applying the foregoing to the record of appellant's interrogation, which we have reviewed in its entirety, including the recording of the interrogation, we conclude that the appellant's admissions/confession were voluntary.  Similar to the trial court, we find that although the interrogation lasted almost seven hours, there were frequent breaks during which appellant was provided food, drink and a restroom break.  Thus, the actual questioning lasted less than five hours. Appellant remained coherent throughout the interview.  He addressed the officers by their first name indicating that he was relaxed.  He appeared to understand the questions and responded with appropriate answers.  Appellant never indicated or suggested that he wanted to terminate the interview.  Appellant was questioned by only two officers at any one time.

Appellant, a mature adult male, with previous experience of talking to law enforcement, only mentioned his physical condition near the end of the interview when he claimed that he was going to be sick, and then later, that he could not think straight.  Appellant had already confessed to the shooting long before this point in the interview.  It appears to this court that he was expressing concern over the gravity of his situation rather than a deteriorating physical condition.

Although the officers told appellant that they had more evidence than they actually had, the use of police deception does not necessarily invalidate an incriminating statement.  (*People v. Smith* (2007) 40 Cal.4th 483, 505 (*Smith* ).) As the *Smith* court noted, repeatedly courts have found "proper interrogation tactics far more intimidating and deceptive than those employed in this case. (*See, e.g., Frazier v. Cupp* (1969) 394 U.S. 731, 739 ... [officer falsely told the suspect his accomplice had been captured and confessed]; *People v. Jones* (1998) 17 Cal.4th 279, 299 ... [officer implied he could prove more than he actually could]; *People v. Thompson* (1990) 50 Cal.3d 134, 167 ... [officers repeatedly lied, insisting they had evidence linking the suspect to a homicide]; In re Walker

15

(1974) 10 Cal.3d 764, 777 ... [wounded suspect told he might die before he reached the hospital, so he should talk while he still had the chance]; *People v. Watkins* (1970) 6 Cal.App.3d 119, 124-125 ... [officer told suspect his fingerprints had been found on the getaway car, although no prints had been obtained]; and *Amaya-Ruiz v. Stewart* (9th Cir .1997) 121 F.3d 486, 495 [suspect falsely told he had been identified by an eyewitness].)" (*Smith, supra,* 40 Cal.4th at p. 505.) The focus is on whether the deception is "of a type reasonably likely to procure an untrue statement...." (*People v. Farnam* (2002) 28 Cal.4th 107, 182.)

Here the officers confronted appellant with fabricated test results that purported to show that hairs from appellant's dog showed up on the gun case appellant had planted at Rick Reinhardt's residence, that there was appellant's DNA on a set of keys to Bianco's house and there was a tape recording of him engaging in a incriminating conversation about burglarizing Bianco's residence.  It was not until much later in the conversation, after appellant was confronted with numerous inconsistencies in his prior stories, that he confessed.  Furthermore, even though appellant admitted that a conversation with Motschenbacher, Rooney and Bordin might have taken place, he steadfastly denied that he killed Bianco for a significant period of time after he was confronted with this evidence.  Appellant's ability to admit he might have engaged in a conversation with Motschenbacher, Rooney and Bordin, while steadfastly denying that he killed Bianco demonstrates that his will was not overborne by the police ruse. (*People v. Mays* (2009) 174 Cal.App.4th 156, 167.)

As to appellant's claim that the officers made implied promises of leniency and impliedly threatened him with the death penalty, similar to the trial court, we do not find that the officers explicitly or implicitly promised appellant leniency or threatened him with the death penalty if he did not confess.

"'Once a suspect has been properly advised of his rights, he may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits.  Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect.... Yet in carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession.... [The police] are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise.' [Citation.]" (*People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway* ).)

Of course, the "line 'can be a fine one' [citation] between urging a suspect to tell the truth by factually outlining the benefits that may flow from confessing, which is permissible, and impliedly promising lenient treatment in exchange for a confession, which is not." (*Holloway, supra,* 33 Cal.4th at p. 117.)

United States District Court
Northern District of California

Appellant claims that the officers' actions in promising to "go to the DA and fight for [him]" if he told the "whole truth" was an implied promise of leniency. Respectfully, we disagree. The statements made by the officers did not imply that by cooperating and relating what actually happened, appellant might not be charged with, prosecuted for, or convicted of the murder of Bianco. The interviewing officers did not suggest they could influence the decisions of the district attorney. They simply informed appellant that full cooperation might be beneficial in an unspecified way. Indeed, the officers specifically told appellant that they could make no promises to him and expressly stated that they were not allowed to talk about punishment. In this case Sergeant Manion's "offers of intercession with the district attorney amounted to truthful implications that [appellant's] cooperation might be" beneficial to appellant. (*People v. Jones* (1998) 17 Cal.4th 279, 298.)

Nor do we find that the officers threatened appellant with the death penalty. Although Sergeant Manion mentioned the Scott Peterson case and the result of that case, it was in comparison to the strength of the circumstantial evidence of this case as compared to the Peterson case. Even if we assumed for the sake of argument appellant was aware that Peterson had just received the death penalty, "'a confession will not be invalidated simply because the possibility of a death sentence was discussed beforehand' [citation] but only where the confession results directly from the threat such punishment will be imposed if the suspect is uncooperative, coupled with a 'promise [of] leniency in exchange for the suspect's cooperation' [citation]." (*Holloway*, *supra*, 33 Cal.4th at p. 116.) No such threats or promises were made here.

In conclusion, we find that substantial evidence supports the trial court's findings and the trial court properly admitted appellant's confession/admissions at trial.

*People v. Mays*, 2011 WL 18743, at *11-17.

## B.   Legal Standard

Admission of a defendant's involuntary confession violates both the Fifth Amendment right against self-incrimination and the Fourteenth Amendment right to due process of law. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000). Voluntariness of a confession is not a factual issue entitled to a presumption of correctness under 28 U.S.C. § 2254(d), but is a legal question meriting independent consideration in a federal habeas corpus proceeding. *See Miller v. Fenton*, 474 U.S. 104, 115-16 (1985); *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (federal court reviewing admissibility of defendant's confession is not bound by state court's finding of voluntariness, but has a "duty to make an independent evaluation of the record.") That said, a state court's *subsidiary* factual conclusions are entitled the presumption of correctness. *See Rupe v. Wood*, 93 F.3d 1434,

1444 (9th Cir.1996).  Not only must federal habeas courts accord credibility determinations

deference, factual determinations such as credibility are "presumed to be correct."  *See* 28 U.S.C. §

2254(e)(1); *Knaubert v. Goldsmith*, 791 F.2d 722, 727 (9th Cir.1986).

Voluntariness is to be determined in light of the totality of the circumstances.  *See Miller v.*

*Fenton*, 474 U.S. 104, 112 (1985).  The factors to be considered include the degree of police

coercion; the length, location and continuity of the interrogation; and the defendant's maturity,

education, physical condition, mental health, and age.  *Withrow v. Williams*, 507 U.S. 680, 693-94

(1993).  The voluntariness inquiry is not limited to police conduct that is inherently coercive, but also

applies to interrogation techniques where, under the particular circumstances of the case, the

confession was likely not the result of free will.  *See United States v. Preston*, 751 F.3d 1008, 1016

(9th Cir. 2014) (citing *Miller*, 474 U.S. at 110).  The voluntariness determination therefore depends

on "a weighing of the circumstances of pressure against the power of resistance of the person

confessing."  *Id.* (internal citations omitted).

Absent threats or promises, deception alone will not render confession involuntary.  *Ortiz v.*

*Uribe*, 671 F. 3d 863, 869 (9th Cir. 2011).  Lying about or exaggerating the amount of evidence

against a criminal defendant does not create deception that rises to the level of a constitutional

violation.  *See Frazier v. Cupp*, 394 U.S. 731, 739 (1969).  In cases involving psychological

coercion, "the pivotal question... is whether[, in light of the totality of the circumstances,] the

defendant's will was overborne when the defendant confessed."  *Ortiz*, 671 F. 3d at 869 (citing

*United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir.1993)).

C.     **Discussion**

Petitioner argues that his confession was involuntary, and that the appellate court's

affirmance of its admission at trial deprived him of his Fifth and Fourteenth Amendment rights.  He

argues that the confession was obtained by false promises of leniency, improper threats to seek the

death penalty, exaggeration of the evidence, plus other characteristics of the interrogation which

made it coercive and involuntary.  The Court finds that, under the totality of the circumstances as

determined by the trial court, Petitioner has not demonstrated that his will was overborne or his

confession coerced.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 1.    *Promises of Leniency*

The totality of the circumstances test for the voluntariness of a confession focuses first on the degree of coercive police activity.  *See Withrow*, 507 U.S. at 693-94; *see also Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment").  As the appellate court affirmed, Petitioner has not shown that the tactics the investigators used here were so coercive as to render his confession involuntary.

As a preliminary matter, there are no allegations that the interrogators employed physical violence.  Rather, Petitioner argues that the interrogators promised him leniency if he confessed. Petitioner testified that one of the interrogating officers told him "[i]f you tell me everything I will go to the DA and fight for you."  (Dkt. No. 1 at 7; 2 Clerk's Transcript ["CT"] at 272:16.)  The context surrounding that statement demonstrates that it is not evidence of coercion.  Just after the interrogator made that statement, Petitioner asked the interrogator what information he wanted.  (2 CT at 272:17.) The interrogator told Petitioner that he wanted the "whole truth," and that he did not want Petitioner to tell him "somethin' [he] didn't do."  (*Id.* at 272:18-24.)  Those statements demonstrate that, while the interrogators promised to advocate for Petitioner, they made it clear to Petitioner that they only wanted the truth, and did not promise that Petitioner would receive a more lenient sentence if he confessed.  Under those circumstances, the interrogators' promise that they would "fight for" Petitioner did not constitute sufficient coercion such as would render the confession involuntary.  *See Connelly*, 479 U.S. at 167.  The Court agrees with the court of appeal's conclusion that no promise of leniency was made in exchange for the confession.  *People v. Mays*, 2011 WL 18743, at *16.

### 2.    *Threats of Death Penalty*

Petitioner next argues that his confession was coerced because his interrogators threatened him with the death penalty.  The police interrogators asked him, "[d]o you see yourself burning by not saying anything?"  (2 CT 288:22-23.)  The interrogators also made repeated comparisons to the then-recent Scott Peterson case, in which Peterson had received the death penalty.  (2 CT at 142:7-143:20, 258:8-13.)  The interrogators told Petitioner that the evidence against him was better than the evidence in the Scott Peterson case, but they did not say that because they had better evidence than in

United States District Court
Northern District of California

1    the Scott Peterson case it was certain or even more likely that Petitioner would receive the death

2    penalty if he did not confess.  In fact, they refused to discuss potential punishments.  (2 CT at 281:9-

3    11, 294:19-20.)

4           Furthermore, Petitioner cites no Supreme Court authority to suggest his interrogators'

5    statements (*i.e.* about a recent death penalty conviction in a different murder case, or "see[ing]

6    yourself burning" by not confessing) rendered his confession involuntary.  Thus, Petitioner has not

7    shown that the appellate court's ruling was contrary to or an unreasonable application of clearly

8    established federal law.

9                         **3.      Exaggerating Evidence**

10          Petitioner also argues that his Fifth and Fourteenth Amendment rights were violated when the

11   interrogators exaggerated the evidence against him.  Again, deception by the interrogators will not

12   render a confession involuntary where it is not accompanied by threats or promises.  *See Ortiz*, 671

13   F. 3d at 869.  Lying about or exaggerating the amount of evidence against a criminal defendant does

14   not create deception that rises to the level of a constitutional violation.  *See Frazier*, 394 U.S. at 739;

15   *Miller*, 984 F.2d at 1031 (deception does not render confession involuntary, citing *Frazier*).  Because

16   Petitioner has not shown that his confession was the result of threats or promises, he cannot show

17   that the deception employed by the investigators was sufficient to render his confession involuntary.

18                   **4.      Misstating the Difference in Penalties Between Different Degrees of Murder**

19          Petitioner further argues that his interrogators misstated the differences in penalties as

20   between a killing in the course of a burglary versus a killing after lying in wait for the victim,

21   causing him to give a false confession.  Petitioner cites no Supreme Court precedent for his argument

22   that the interrogators' misleading statements about the difference in penalties between a killing

23   during a burglary and a killing characterized by lying in wait gave rise to a Constitutional violation.

24   Further, the Court is not aware of any such precedent.

25          Moreover, in light of his interrogators' repeated directives to tell only the truth, (2 CT at

26   272:18-24, 292:16), the Court concludes that any deception concerning the relative penalties for a

27   killing under various circumstances did not "overbear" Petitioner's will.  *Cf. Ortiz*, 671 F. 3d at 869.

28

### 5. *Length of Interrogation and Physical Condition of Defendant*

Petitioner contends that additional factors, as set forth in *Withrow, supra*, 507 U.S. at 693-94, affected the voluntariness of his confession, including the length of the interrogation, and his physical condition.

With respect to the length of the interrogation, the court of appeal found that Petitioner was questioned for approximately five hours, and that the total length of Petitioner's interrogation was seven hours. *People v. Mays*, 2011 WL 18743, at *15. Petitioner does not cite to any Supreme Court authority holding that the length of an interrogation itself may render a confession involuntary. The Ninth Circuit has held that an interrogation of eight hours may be permissible and non-coercive under certain circumstances. *See Clark v. Murphy*, 331 F.3d 1062, 1073 (9th Cir. 2003) (internal citations omitted, overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003)).

Petitioner cites *Spano v. New York* for the proposition that an eight hour interrogation fatigues the suspect to the point of coercion. 360 U.S. 315, 322 (1959) ("In such circumstances slowly mounting fatigue does, and is calculated to, play its part."). However, *Spano* is distinguishable from the facts here. In *Spano*, questioning continued despite the defendant's refusal to answer on the advice of an attorney and his repeated requests to call his attorney. *Id.* Here, Petitioner made no such refusal or request, but instead maintained his denial of any involvement in the victim's death until he ultimately confessed. Further, unlike the defendant in *Spano*, who was questioned for eight hours straight, the duration of Petitioner's actual questioning was five hours, and he was given several breaks throughout the interrogation. *Id.*; *People v. Mays*, 2011 WL 18743, at *15. In light of those differences and subsequent case law holding that interrogations longer than Petitioner's are permissible, *Spano* does not control.

Petitioner argues that his statements during the interrogation that he was "gonna be sick" and that he could not "even think straight right now" show that his physical well-being during the interrogation was compromised and support a conclusion that his confession was involuntary. (Dkt. No. 1 at 39; 2 CT at 372:18-23.) However, as the court of appeal determined, Petitioner made these statements *after* he had already confessed. *People v. Mays*, 2011 WL 18743, at *15. In that light, they are most logically read as Petitioner's reaction to the gravity and consequences of the

confession he had just made, and not as references to any physical ailment that might have affected his ability to exercise his free will.

An analysis of the remaining factors set forth in *Withrow* supports the finding that Petitioner's confession was not involuntary.  Petitioner was afforded several breaks, and was provided food and beverages.  *People v. Mays*, 2011 WL 18743, at *15.  Petitioner was an adult who, at the time of the interrogation, had previously had experience with the criminal justice system.  *Id.* He appeared comfortable with his interrogators, and he referred to them by their first names.  *Id.* Though he was known to have used methamphetamine on prior occasions, the officers saw no signs of him being under the influence at the time.  *Id.*  He was not physically small, weak, or disabled and did not seem to be intimidated by the officers.  *Id.*  These subsidiary findings of fact reached by the trial court and affirmed by the court of appeal are, by law, entitled to a presumption of correctness on habeas review.  *See* 28 U.S.C. § 2254(e)(1); *Knaubert*, 791 F.2d at 727.  The Court can find no justification for finding them invalid or ill-considered.  Ultimately, they support a determination that Petitioner's confession was not coerced.

### 6.    *Conclusion*

In sum, and taking into account the totality of the circumstances, the Court finds that Petitioner's will was not "overborne," that his confession was not coerced, and his decision to confess was voluntary.  *See Ortiz*, 671 F. 3d at 869.  Admission of the confession did not violate Petitioner's Fifth and Fourteenth Amendment rights.  Accordingly, habeas relief on this claim is **DENIED.**[2]

## II.    JUROR MISCONDUCT

### A.    BACKGROUND

Petitioner contends that the trial court erred when it allowed jury deliberation to proceed after Juror No. 8's misconduct of imparting information during the deliberation to the effect that Petitioner had already been convicted of the crime about which they were deliberating and had been given a

---

[2]  Because the Court finds that the confession was voluntary, it does not reach the issue of whether its admission was harmless.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   sentence of 50 years to life.  (Dkt. No. 1 at 15.)  Taking all the circumstances into consideration, the

2   Court finds no prejudicial error in the trial court's decision and the appellate court's affirmance.

3          Once the trial court became aware of the juror's statements it questioned each of the jurors

4   about whether they had heard what the juror had said.  (*See, e.g.,* 7 Reporter's Transcript ["RT"] at

5   1183:15-25.)  Seven of the other eleven jurors reported that they had heard Juror No. 8's statements

6   about Petitioner's previous conviction for the same crime.  (*See, e.g., id.* at 1183:25 - 1184:20.)  Each

7   of the seven jurors who heard the statement told the court that they could set aside what Juror No. 8

8   had said and decide the case based on the evidence presented in court.  (*See, e.g., id.* at 1185:3 -

9   1186:5.)  Satisfied that the jurors could remain impartial, the court excused Juror No. 8 and denied

10  Petitioner's motion for a mistrial.[3]  (7 RT at 1198:17-21, 1199:8-11.)  The state appellate court

11  affirmed the decision, reasoning as follows:

> Appellant asserts that the information that Juror No. 8 imparted to some of the
> remaining jurors eroded the presumption of innocence. Although he conceded
> that he killed Peter Bianco, the key issue at trial was his state of mind: that is,
> whether he killed Bianco in a scuffle, which could result in a verdict of
> manslaughter, or whether the killing arose during a burglary and he was guilty of
> first degree felony murder.  The jurors' knowledge that he had already been
> convicted of murder, not manslaughter and had been sentenced to 50 years to life
> imprisonment was not information that should have factored into the jurors'
> deliberations.  It is something they should not have known.  He argues that if the
> jurors believed that a previous jury had convicted him of murder, this may have
> given one or more of them the impetus to do the same.
>
> Appellant points out that during voir dire, prospective jurors who had knowledge
> of the case were excused for cause. Respondent counters that appellant's
> assertion that numerous jurors were excused for cause during initial jury selection
> solely because they possessed knowledge about the case is both factually and
> legally flawed. His assertion is unsupported by the current record, pointing only
> to his own brief in support of the motion for a mistrial, which does not even
> mention the for-cause dismissal of other jurors. On this court's own motion we
> augmented the record with the transcript of jury selection. The record indicates
> that during jury selection three prospective jurors were excused for cause after
> they admitted that they had conducted a search on the Internet and learned
> information about the case. As to one of the prospective jurors, the court
> explained that the information he had read could have been incorrect, inaccurate

---

27

28   [3]  Although both the prosecution and defense requested that Juror No. 8 be removed for
cause, the trial court ultimately excused her due to a medical issue and not her statements regarding
the defendant, since the trial court was unable to ask her about her statements.  (7 RT 1198:17-21.)

23

or distorted. Thereafter, the juror assured the court that he could still be fair and impartial and decide the case on the evidence received in the courtroom.

Later, when the court questioned the juror outside the presence of the rest of the prospective jurors, the court learned that the juror had "read quite a bit of details about allegedly what had taken place. You know, what state the body was found in, the circumstances surrounding the discovery; that Mr. Mays may be a suspect on the crime versus his friend, Mr. Reinhardt." Further, he had read "an article about the previous court proceedings and why [they were] here today instead of the previous trial commencing."

Even though the juror had assured the court that he could decide the case on the evidence, the court excused the juror for cause stating, "you have so much detailed information about this case, I got the impression you said you could set it aside and listen to the case. But if you have too much information that really isn't relevant to what's going on, you know, the procedure, history and I'm telling you this as a courtesy, what I'm going to do, out of [an] abundance of caution, is excuse you at this time per stipulation because you just have too much information."

"A defendant accused of a crime has a constitutional right to a trial by unbiased, impartial jurors. [Citations.] A defendant is 'entitled to be tried by 12, not 11, impartial and unprejudiced jurors. "Because a defendant charged with a crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." [Citations.]' [Citations.]" (*People v. Nesler* (1997) 16 Cal.4th 561, 578 (*Nesler* ).)

"Juror misconduct, such as the receipt of information about a party or the case that was not part of the evidence received at trial, leads to a presumption that the defendant was prejudiced thereby and may establish juror bias. [Citations.] 'The requirement that a jury's verdict "must be based upon the evidence developed at the trial" goes to the fundamental integrity of all that is in the constitutional concept of trial by jury.... [¶] In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.' [Citation.] As the United States Supreme Court has explained: 'Due process means a jury capable and willing to decide the case solely on the evidence before it ....' [Citations.]" (*Nesler, supra,* 16 Cal.4th at p. 578.)

Even "a juror's inadvertent receipt of information that had not been presented in court falls within the general category of 'juror misconduct.' [Citations.]" (*Nesler, supra,* at p. 579.) "Although inadvertent exposure to out-of-court information is not blameworthy conduct, as might be suggested by the term 'misconduct,' it nevertheless gives rise to a presumption of prejudice, because it poses the risk that one or more jurors may be influenced by material that the

defendant has had no opportunity to confront, cross-examine, or rebut." (*Ibid.*) Accordingly, we treat the receipt of the information that appellant had been convicted previously in the case and had received 50 years to life in state prison (hereafter the extraneous information), inadvertent as it concededly was, under the rubric of juror misconduct.

Once we conclude there was misconduct, "we then consider whether the misconduct was prejudicial. This standard is well established. '[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways.'" (*People v. Danks* (2004) 32 Cal.4th 269, 303.)

"'First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.' [Citation.] 'Under this standard, a finding of "inherently" likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. Application of this "inherent prejudice" test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information.'" (*People v. Danks*, supra, 32 Cal.4th at p. 303.)

Second, under what is sometimes referred to as the "'circumstantial' test" (*In re Carpenter* (1995) 9 Cal.4th 634, 654), "'even if the extraneous information was not so prejudicial, in and of itself, as to cause "inherent" bias under the first test,' the nature of the misconduct and the 'totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose.' [Citation.]" (*People v. Danks*, supra, 32 Cal.4th at p. 303.) Actual bias occurs where a juror is "unable to put aside [his or] her impressions or opinions based upon the extrajudicial information [he or] she received and to render a verdict based solely upon the evidence received at trial." (*Nesler, supra,* 16 Cal.4th at p. 583.) Under this second test, "'"The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual" 'bias." (*People v. Danks, supra,* 32 Cal.4th at p. 303.)

As noted, in ruling on defense counsel's motion to declare a mistrial, the court decided to excuse Juror No. 8 because she had called in sick with Vertigo and was not able to return to court for at least three or four days. Thereafter the court stated that "based on all the information the Court has heard from the jurors, comments by counsel, the motion [to declare a mistrial] will be denied at this time." The court did not explicitly make any findings of fact.

25

After the court replaced Juror No. 8 with an alternate, the court reminded the jury again that they had to decide the case based only on the evidence they had heard in the courtroom.

"We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.]  Whether prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination." (*Nesler, supra,* 16 Cal.4th at p. 582.)

"In an extraneous-information case, the 'entire record' logically bearing on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant. For example, the stronger the evidence, the less likely it is that the extraneous information itself influenced the verdict." (*In re Carpenter, supra,* 9 Cal.4th at p. 654.)

Implicitly, respondent agrees that there was misconduct in this case, but disagrees with appellant that there was a substantial likelihood of juror bias in this case. We agree that the fact that the jurors inadvertently received information, albeit not all true, that appellant had been convicted of murder in a previous trial and had been sentenced to 50 years to life, was misconduct, which raises the presumption of prejudice.

In essence, appellant contends that the extraneous information was so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror because it eroded the presumption of innocence.

Respectfully, we disagree.  First, the jurors had no way of knowing if the information was correct.  In fact the trial court informed all the jurors that heard the extraneous information that it was based on misinformation.  Second, even if true (as part of it was), if appellant's first conviction in this case had been what could be termed a "good" conviction, then there would have been no reason to have a second trial.  Therefore, it follows that no rational juror could possibly believe that because a jury convicted appellant once of murder he or she should do the same.  It would be obvious to a reasonable juror that any conclusions or deductions derived from the extraneous information would be potentially erroneous and unreliable.  Judged objectively, the extraneous information was not inherently and substantially likely to have influenced the jury.  Thus, we find the presumption of prejudice rebutted.

Having concluded that the extraneous information some members of the jury heard was not inherently prejudicial, we now consider "the nature of the misconduct and the surrounding circumstances" to determine whether it is substantially likely that those jurors were nevertheless actually biased as a result of hearing the information.  (*Nesler, supra,* 16 Cal.4th at p. 579.)

United States District Court
Northern District of California

1
2
3
4

In general, when the evidence of guilt is overwhelming, the risk that exposure to extraneous information will prejudicially influence a juror is minimized.  (*In re Hamilton* (1999) 20 Cal.4th 273, 301, fn. 21.)  An admonition by the trial court may also dispel the presumption of prejudice arising from any misconduct.  (*People v. Zapien* (1993) 4 Cal.4th 929, 996.)

5
6
7
8
9
10
11
12
13

Even though Motschenbacher testified at trial that there was no discussion about burglarizing Bianco's house, the evidence appellant killed Bianco in the course of a burglary was overwhelming.  Rooney's and Bordin's testimony established that appellant had discussed burglarizing Bianco's house and that Motschenbacher had given him a key.  When Detective Kurz first conducted a protective sweep of Bianco's house she found no signs of a forced entry and the house appeared to be completely ransacked.  The autopsy results in particular do not support either of appellant's versions of events.  That is, Bianco had the gun first, they struggled over it and he "freaked out" and shot Bianco four or five times, which is what he testified; or he was surprised by Bianco in the garage, Bianco came at him with a pole or club and he panicked and shot him from two feet away.  According to the results of the autopsy, Bianco was shot first in the back from some distance away and finally at very close range, probably with the gun in contact with the skin, between the eyes.  Neither of appellant's scenarios fit these facts.

14
15

Accordingly, we conclude that it is not substantially likely that the jurors that heard the extraneous information concerning appellant were actually biased as a result.

16
17

Thus, under either of the two tests for juror bias, we reject appellant's assertion that he was denied a fair trial by an unbiased jury.

18
19

*People v. Mays,* 2011 WL 18743, at *7-11.

20

**B.     Legal Standard**

21

Criminal defendants have a constitutional right under the Fourteenth and Sixth Amendments

22

to a trial by fair, impartial jurors.  *Duncan v. Louisiana*, 391 U.S. 145, 148-49 (1968); *Irvin v. Dowd*,

23

366 U.S. 717, 721-22 (1961).  Impartiality of jurors is a question of fact, and, as such, is presumed to

24

be correct unless rebutted by the habeas petitioner.  28 U.S.C. § 2254(e)(1); *Skilling v. United States*,

25

561 U.S. 358, 386 (2010) ("Reviewing courts are properly resistant to second-guessing the trial

26

judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a

27

host of factors impossible to capture fully in the record."); *Patton v. Yount*, 467 U.S. 1025, 1038

28

United States District Court
Northern District of California

1    (1984) (trial court's conclusion that a juror was not biased is a finding of fact entitled to "special

2    deference").

3         Constitutionally impermissible prejudice is strongly presumed whenever members of the jury

4    receive extrinsic information about the case in which they must return a verdict.  *Xiong v. Felker*,

5    681 F.3d 1067, 1076 (9th Cir. 2012) (citing *Remmer v. United States*, 347 U.S. 227, 228 (1954)),

6    *cert. denied*, 133 S. Ct. 989 (2013).  Juror bias can be inferred where a juror is "apprised of such

7    prejudicial information about the defendant that the court deems it highly unlikely that he can

8    exercise independent judgment even if the juror states he will."  *Estrada v. Scribner*, 512 F.3d 1227,

9    1240 (citing *Coughlin v. Tailhook Ass'n*, 112 F.3d 1052, 1062 (9th Cir. 1997)).  However, due

10   process does not require a new trial every time a juror has been placed in a potentially compromising

11   situation.  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  Instead, the presumption of prejudice is

12   rebuttable, and the burden rests upon the government to show that the information received by the

13   jurors was harmless.  *Xiong*, 681 F.3d at 1076.

14        Several factors are relevant to an assessment of whether the government has overcome the

15   presumption of prejudice.  *Thompson v. Borg*, 74 F. 3d 1571, 1578 (9th Cir. 1996).  Among those

16   factors are: (1) whether the material was actually received, and if so, how; (2) the length of time it

17   was available to the jury; (3) the extent to which the juror(s) discussed and considered it; (4) whether

18   the material was introduced before a verdict was reached, and if so at what point in the deliberations;

19   and (5) any other matters which may bear on the issue of the reasonable possibility of whether the

20   extrinsic material affected the verdict.  *Sassounian v. Roe*, 230 F. 3d 1097, 1109 (9th Cir. 2000);

21   *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986).  As part of the fifth factor, courts consider

22   such matters as: (1) whether the prejudicial statement was ambiguously phrased; (2) whether the

23   extraneous information was otherwise admissible or merely cumulative of other evidence adduced at

24   trial; (3) whether a curative instruction was given or some other step taken to ameliorate the

25   prejudice; (4) the trial context; and (5) whether the statement was insufficiently prejudicial given the

26   issues and evidence in the case.  *See Mancuso v. Olivarez*, 292 F.3d 939, 952 (9th Cir. 2002).

27

28

Finally, even if a state court is found to have committed a constitutional error, habeas relief is warranted only if that error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry*, 532 U.S. at 784 (quoting *Brecht*, 507 U.S. at 637).

### C.   Discussion

Petitioner argues that the trial court's decision to allow jury deliberation to continue after a juror introduced extrinsic evidence of his prior guilty plea violated his rights Fourteenth Amendment right to due process and Sixth Amendment right to a fair trial.  (Dkt. No. 1 at 18.)  The Court agrees with the court of appeal in this matter that, although Juror No. 8's statements to her fellow jurors raise a presumption of prejudice, that presumption is rebutted by the curative steps the trial court took, and the jurors' assurances that they could be impartial.  Further, Petitioner has not shown that the juror misconduct had a substantial and injurious effect, given the overwhelming evidence in favor of the jury's findings.

### 1.   *Presumption of Prejudice and Finding of Rebuttal*

Upon interviewing each member of the jury, save for the juror who introduced the extrinsic information, the trial court learned that seven jurors had heard the statements.  As the court of appeal held, this was sufficient to raise a presumption that Petitioner was prejudiced by Juror No. 8's conduct.  However, the court of appeal concluded that this presumption of prejudice was conclusively rebutted by the circumstances surrounding the introduction of the extrinsic evidence and the trial court's efforts to ameliorate its effect.  *People v. Mays*, 2011 WL 18743, at *10.  Under the AEDPA standard, in order to prevail on his request for habeas relief, Petitioner must show that the court of appeal's conclusion was unreasonable.  *See* 28 U.S.C. § 2254(e)(1); *Patton*, 467 U.S. at 1038 (trial court's conclusion that a juror was not biased is a finding of fact entitled to "special deference").  The Court finds that, taking into account the factors established by the Ninth Circuit in *Sassounian* and *Mancuso*, Petitioner has not established the unreasonableness of the court of appeal's determination.

The first *Sassounian* factor asks whether the information was actually received by the jury, and, if it was received, how.  Here the information was actually heard by seven of the jurors who ultimately returned a guilty verdict.  Those jurors heard that information from another juror during

the course of deliberation.  (*See, e.g.,* 7 RT at 1183:15-25.)  Introduction of evidence not presented in the court room into the jury room is wholly impermissible.  *See Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965) (evidence against a criminal defendant must "come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right[s]").  Because this evidence against the defendant was heard by a majority of the jury and was not brought out in trial, this factor supports granting the writ.

The second factor seeks to determine how long the extrinsic evidence was available to the jury.  The extrinsic evidence was introduced on March 27, 2009, the second day of deliberation and a Friday.  The trial court gave its curative instructions on the following Monday, and deliberation continued for three more days.  Thus, the members of the jury that heard the extrinsic evidence were aware of it for most of the deliberation.  However, the time during which they had the information before the court instructed them to disregard it was relatively short by comparison.  This factor does not strongly support granting or denying the writ.

The third factor takes into account how much the jurors considered the information and discussed it among themselves.  With respect to this fact, the record indicates that not all of the jurors heard the comment as Juror No. 8 was soft-spoken.  Some of those who did hear it indicated that Juror No. 8 made it in response to a juror's curiosity about the delay between the events and the trial.  All of the jurors said that the extrinsic evidence was not discussed by anyone in the jury room from the time of its introduction by Juror No. 8 to the time of the trial court's voir dire of the jurors on the next court day.  (*See, e.g.,* 7 RT at 1186:2-5.)  When the court interviewed each of the jurors the following Monday, none reported engaging in any discussion of the information that went beyond questioning how Juror No. 8 became aware of the information and asking whether it should be reported to the court.  (*See, e.g.,* 7 RT at 1171:19-26.)  This factor does not support granting the writ.

The fourth factor considers the point in the deliberations that the information was introduced.  Juror No. 8 made the comments on a Friday, the second day of deliberation.  After the weekend, the trial court interviewed the jurors on Monday, and the jury continued deliberating for three more days.  On one hand, if any members of the jury considered Juror No. 8's comments in their deliberations, those comments colored a substantial majority of the deliberations.  On the other hand, the jurors

30

1  were instructed to disregard Juror No. 8's comments soon after they were made. If the comments had

2  had any lasting impact, the deliberations presumably would not have continued for as long as they

3  did.  Crediting the juror's fidelity to the court's instruction, the relative importance of this factor is

4  diminished.  It neither strongly supports granting or denying the writ.

5  The fifth factor looks to any other evidence suggesting that the information affected the jury's

6  impartiality.  Within this factor the Ninth Circuit has held that courts should analyze whether the

7  prejudicial statement was ambiguously phrased, whether it was otherwise admissible or was

8  cumulative, whether a curative instruction was given, the trial context, and how prejudicial the

9  statement was.  *Mancuso*, 292 F.3d at 952.  These considerations cut both ways in the case at bar.

10  The nature of Juror No. 8's statements, indicating that Petitioner had already been determined

11  to be guilty of the crime on which they were deliberating, favors granting the writ.  Although the

12  exact words Juror No. 8 used are unknown, all of the jurors understood Juror No. 8 to be telling them

13  that Petitioner had received a long prison sentence after having previously been accused of the same

14  crime, whether because he pleaded guilty or because another jury found him guilty.  (*See, e.g.,* 7 RT

15  at 1168:25-1169:9.)  The information was not evidence introduced at trial, and would have been

16  inadmissible under both state and federal law.  *See* Fed. R. Evid. 410 (withdrawn guilty plea

17  inadmissible); Cal. Evid. Code § 1153 (same).  In sum, the nature of Juror No. 8's statements would

18  be expected to affect the jury's impartiality and would support granting the writ.

19  On the other hand, the trial judge spoke with each juror after learning about Juror No. 8's

20  statements, explained to them that the statements could have been inaccurate and based on

21  misinformation, and instructed them to disregard the statements and render a verdict based solely on

22  evidence that was presented in court.  (*See, e.g.,* 7 RT 1185:13-25.)  All of the jurors that heard the

23  statements told the trial judge that they could disregard Juror No. 8's statements and decide the case

24  based on the evidence presented in court alone.  Based on these assurances and, presumably, the

25  jurors' demeanor and other factors that cannot be captured in the record, the trial judge concluded

26  that all of the jurors would be impartial.  (*See* 7 RT 1199:8-11.)  Again, the impartiality of jurors is a

27  question of fact and is presumed to be correct unless rebutted by the habeas petitioner.  28 U.S.C. §

28  2254(e)(1); *Patton,* 467 U.S. at 1038 (trial court's conclusion that a juror was not biased is a finding

31

of fact entitled to "special deference").  Petitioner has not made a showing such as would support a finding of incorrectness of the trial judge's fact conclusions.

Further, Juror No. 8's statements were not extremely prejudicial.  All of the jurors that heard the statement told the court that they could remain impartial and not allow the statements to affect their deliberation.  Indeed, most of the jurors who heard the statements, when queried said that they immediately chose not to credit them.  (*See, e.g.,* 7 RT 1185:22-1186:2.)

Petitioner argues that the United States Supreme Court's decisions in *Mattox v. United States*, 146 U.S. 140 (1892), *Parker v. Gladden*, 385 U.S. 363 (1966), and *Remmer*, 347 U.S. 227, all support granting the writ here.  Those cases are all distinguishable.  First, in both *Mattox* and *Parker,* the jurors received extrinsic evidence from court personnel (the bailiff) who expressed an opinion that the defendants were guilty or related information about the defendants' prior criminal history. *Mattox*, 146 U.S. 140, 142; *Parker*, 385 U.S. at 363-64.  The Supreme Court in *Parker* specifically relied on the "the fact that the official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury which he had been shepherding for eight days and nights." *Parker*, 385 U.S. at 365.  Further, one of the jurors in Parker testified that she was prejudiced by the extrinsic information.

Here, the juror who imparted the extrinsic evidence was not an officer of the court, and her statements did not carry the same weight as the bailiffs in *Mattox* and *Parker*.  In fact, many of the jurors who heard Juror No. 8's statements dismissed them out of hand.  (*See, e.g.,* 7 RT 1185:22 - 1186:2.)  The trial court questioned each juror individually and obtained their assurances that they were not affected by the information and would only consider the evidence presented at trial.

Second, in *Remmer*, after the verdict had been returned, the defendant learned that an unnamed person had approached a juror during the course of the trial and remarked that the juror could profit by returning a defense verdict.  *Remmer*, 347 U.S. at 228.  The juror reported the incident to the judge, the judge informed the prosecutors, and the matter was investigated by the Federal Bureau of Investigation during the course of the trial, none of which was disclosed to the defense during the trial.  *Id.*  The Supreme Court held that the record did not provide adequate evidence from which the petitioner or the court could know what actually occurred, whether the

investigation of the FBI affected the jurors, and whether the incidents were harmful or harmless. *Id.* at 230. Thus, the Supreme Court remanded the case for further findings. *Id.* at 229. Here, by contrast, there is adequate evidence in the record—specifically the trial court's *voir dire* of the jurors on the court day following Juror No. 8's statements—from which the trial court and appellate court could determine any effect on the juror's partiality.

Both *Mattox* and *Remmer* emphasized that the presumption of prejudice arising from the jurors' exposure to extrinsic evidence may be rebutted with evidence showing the extrinsic information was harmless. *See Mattox*, 146 U.S. at150; *Remmer*, 347 U.S. at 229; *see also Xiong*, 681 F.3d at 1077 ("*Mattox* and *Remmer* teach that…the Government may overcome the presumption of prejudice with proof that the jury's consideration of extrinsic evidence was harmless."). Here, the court of appeal recognized that the extrinsic evidence introduced by Juror No. 8 created a presumption of prejudice, but ultimately concluded that the presumption had been rebutted by the other evidence in the record. People v. Mays, 2011 WL 18743, at *10. Petitioner offers no evidence or argument to show that this holding was contrary to or an unreasonable application of Supreme Court precedent. *See* 28 U.S.C. 2254(d).

Having analyzed all of the factors, this Court concludes that the presumption of prejudice was sufficiently rebutted. Certainly "the rights of confrontation and crossexamination are among the fundamental requirements of a constitutionally fair trial." *Parker*, 385 U.S. at 365. But not every instance of juror misconduct will result in prejudice. *Smith, supra*, 455 U.S. at 217 ("due process does not require a new trial every time a juror has been placed in a potentially compromising situation[; w]ere that the rule, few trials would be constitutionally acceptable"). The trial court's resolution of questions of juror impartiality is entitled to special deference. *Patton*, 467 U.S. at 1038. Petitioner has not offered a sufficient basis for finding the trial court's determination to deny a mistrial to be unreasonable.

### 2. *Substantial and Injurious Effect*

Even if the decision not to declare a mistrial and to allow deliberation to continue with the jurors who heard Juror No. 8's statements was constitutional error, Petitioner cannot show that the introduction of those statements had a "substantial and injurious effect on the verdict." *Penry*, 532

U.S. at 784 (quoting *Brecht*, 507 U.S. at 637).  The evidence that Petitioner was guilty was substantial.  During a recorded interrogation he admitted to killing the victim during the course of a burglary.  Ballistics testing contradicted his version of the story, showing that instead of all of the shots being fired during a struggle, as Petitioner claimed, the fatal shot was fired with the gun pressed against the victim's forehead.  The jury also heard testimony from witnesses who had conversations with Petitioner about plans to burglarize the victim's home.  With this evidence and the other evidence presented against Petitioner, the jury had more than enough properly admitted evidence with which to find Petitioner guilty of first degree murder.  Under those circumstances, any prejudice to Petitioner was minimal at most.

Again, the trial court interviewed each juror about the statements, polled each juror who heard the remarks as to their impartiality, and instructed those jurors to disregard the statements and decide the case based only on the evidence presented in court.  In sum, with the strong evidence against him and the trial court's efforts to ensure that the jurors who would ultimately reach a verdict in the case were impartial, Petitioner cannot show that Juror No. 8's comments had a substantial and injurious effect upon the verdict.  Consequently, habeas relief on this claim is **DENIED.**

## CONCLUSION

For the reasons stated above, the Court finds Petitioner is not entitled to habeas relief. Accordingly, his petition is **DENIED** and a certificate of appealability will not issue.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Date: November 24, 2014

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**